**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | |
|---|---|
| BOBBY K. SCOTT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMMISSIONER OF THE )<br>SOCIAL SECURITY ADMINISTRATION, )<br>)<br>Defendant. ) | Case Number: 6:18-cv-00452-JHE |

**CORRECTED MEMORANDUM OPINION**[1]

Plaintiff Bobby K. Scott brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's final decision denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI").[2] Upon review of the record and the relevant law, the court is of the opinion that the Commissioner's decision is due to be **REVERSED,** and this action **REMANDED** for further administrative proceedings.

**I. Procedural History**

Scott protectively filed applications for a period of disability, DIB, and SSI on January 21, 2015, alleging he became unable to work beginning January 15, 2015. (Tr. 144-154). He later amended his alleged onset date to September 17, 2015. (Tr. 165). The Agency denied his claims initially and Scott requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 82-88).

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 18).

[2] The judicial review provisions for DIB claims, 42 U.S.C. § 405(g), apply to claims for SSI. *See* 42 U.S.C. § 1383(c)(3).

Scott attended the hearing on November 2, 2016, at which the ALJ received testimony from a vocational expert. (Tr. 32-57). After the hearing, the ALJ found that Scott was not under a disability at any time through the date of the decision. (Tr. 25).

Scott then requested review of the ALJ's decision by the Appeals Council. (Tr. 7). The Appeals Council denied Scott's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Following denial of review by the Appeals Council, Scott filed a complaint in this court seeking reversal and remand of the Agency's decision. (Doc. 1.)

## II. Standard of Review[3]

In reviewing claims brought under the Social Security Act, this court's role is a narrow one: "Our review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This Court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*.

This Court must uphold factual findings supported by substantial evidence. "Substantial evidence may even exist contrary to the findings of the ALJ, and [the reviewing court] may have taken a different view of it as a factfinder. Yet, if there is substantially supportive evidence, the findings cannot be overturned." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). However,

---

[3] In general, the same legal standards apply whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations.

the Court reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is currently engaged in substantial gainful activity;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals the criteria contained in one of the Listings of Impairments;
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work which exists in significant

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

numbers in the national economy.

*Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001). *See also McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). At Step 5, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work available in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and past work experience. *Id*.

## IV. Findings of the Administrative Law Judge

At Step One, the ALJ concluded that Scott had not engaged in substantial gainful employment since September 17, 2015, his amended alleged onset date. (Tr. 18). At Step Two, the ALJ determined that Scott suffered from the medically determinable impairments of fibromyalgia, degenerative disc disease, arthritis, schizoaffective disorder, and panic disorder with agoraphobia. (Tr. 18). At Step Three, the ALJ found that none of Scott's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. (Tr. 19). Before proceeding to Step Four, the ALJ determined Scott's residual functioning capacity ("RFC"), which is the most a claimant can do despite his impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined that Scott has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except for occasional climbing, balancing, kneeling, crouching, and crawling; avoid all exposure to hazards; limited to simple tasks; occasional contact with others; and off task 10% of the workday. (Tr. 20).

At Step Four, the ALJ determined that Scott retained the ability to perform light work, further limited by only occasional climbing, balancing, kneeling, crouching, and crawling, no exposure to hazards, requirements of only simple tasks and occasional contact with others, and the ability to be "off-task" 10 percent of the work day. (Tr. 20). Based on those limitations, the ALJ concluded Scott could not perform any past relevant work, but other jobs exist in the national

4

economy which accommodated those limitations. (Tr. 25).

**V. Analysis**

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Scott argues that the ALJ erred by failing to state the weight afforded to the opinion of Scott's treating psychiatrist, failing to properly evaluate Scott's complaints of pain; and failing to properly assess the limitations from Scott's mental illness. (Doc. 12). The Commissioner asserts the ALJ properly considered all relevant evidence and substantial evidence supports the ALJ's finding. (Doc. 16). Because the court finds insufficient evidence to support the ALJ's determinations concerning Scott's mental and physical limitations, the decision of the Commissioner will be reversed and remanded for further proceedings.

At the time of his hearing, Scott was twenty-eight years old and a high school graduate, although he received help in special education classes. (Tr. 37-38). He was turned down for military service. (Tr. 38). Scott had worked in a funeral home, but could no longer lift the caskets, and began hearing voices and "seeing things that weren't there anymore." (Tr. 39). Scott got another job as a driver, but due to his medication, could no longer drive. (*Id.*). At the time of the hearing, his biggest impediments to working were due to his pain level, the voices, and the visions. (Tr. 42).

5

As to his pain, Scott explained due to the residual effects of being hit by a drunk driver, he has pain as high as an eight or nine out of ten two or three days a week. (Tr. 43). He is prescribed narcotic pain medications, which make him sleepy and sick to his stomach. (Tr. 44). He has visual hallucinations every day and hears voices constantly. (Tr. 44-45). Despite aggressive treatment from his doctors, the visual and auditory hallucinations continue. (Tr. 45).

Scott believes he could sit 25 to 30 minutes at a time, stand for 30 minutes at a time, and walk 25 yards before needing to rest. (Tr. 45-46). He has multiple postural limitations, such as not being able to bend over to tie his own shoes, but does think he could regularly carry 25 pounds. (Tr. 46). He does no housework, and does not always bathe every day. (Tr. 47). Scott explained some days he just stays in bed due to pain or because "I can't get the voices to shut up. I don't feel like being alive …. I have a newborn baby, but, I've told my wife about it. But, they tell me to spray DEET in my daughter's mouth and kill her, and, now I'm not able to be alone with my daughter." (*Id*.). He has no friends and has not spoken with his family in years. (Tr. 48, 50). He goes nowhere alone because he is not allowed to drive. (Tr. 50).

At the hearing, a vocation expert ("VE") testified an individual who could perform work at the light level further limited by no more than occasional postural limitations, no exposure to hazards, with only simple tasks and no more than occasional contact with others could perform jobs which exist in significant numbers in the national economy, such as assembler, photocopy operator, and packager. (Tr. 55).

The medical records reflect that in April 2014, Scott was seen at the Alabama Orthopedic Institute for pain in his back, knees, ankles, hands, and feet. (Tr. 275). He was diagnosed with carpal tunnel syndrome and degeneration of his lumbar spine. (Tr. 276, 279). X-rays of his back reflected mild spina bifida and x-rays of his ankles showed mild to moderate arthritic changes.

(Tr. 277). Narcotic pain medication was found to help his pain, while walking aggravated it. (Tr. 278). In March 2015 Scott received a body scan and multiple x-rays, all of which were negative. (Tr. 310-324).

The medical records of Dr. Michael Dick, a rheumatologist and one of Scott's regular treating physicians, demonstrate that he has tried numerous drug combinations to help relieve Scott's symptoms of ankle pain, hand pain, hip pain, hand weakness, knee pain, and foot pain. (Tr. 399-407, 614, 616). He noted that injections in Scott's hands helped with his carpal tunnel symptoms, but also noted Scott had multiple tender points. (Tr. 399, 404). In addition to Scott's diagnoses of carpal tunnel syndrome, fibromyalgia, tenosynovitis, bursitis, and sciatica, his medical records reflect anxiety and panic attacks. (Tr. 404, 407). A June 2016 MRI of Scott's lumbar spine found disc desiccation, a small focal central disc protrusion, mild diffuse bulging, and mild spinal stenosis, all at the L5-S1 level. (Tr. 446-447, 624-625).

Scott also received mental health treatment at Integrated Behavioral Health. In 2015, Scott was noted to have a "history of chronic mood dysregulation which is currently at a moderate level of severity. (Tr. 430, 439). His mood problems affected daily functioning, and included low energy, low motivation, crying spells, and anxiety. (Tr. 430). An October 2015 record reflected Scott engaged in social avoidance and he presented as "overwhelmed and frustrated." (Tr. 442). At the time, he had a blunted affect, chronic nightmares, and thought he was having a heart attack. (Tr. 427). He related he was even more isolated and inactive, and did not feel his medication was helping. (*Id.*). Scott was diagnosed with major depressive disorder, recurrent and moderate; panic disorder, chronic post-traumatic stress disorder, and alcohol dependence. (Tr. 428). In December 2015, the record reflects that Scott's symptoms had worsened to the point hospitalization was needed, to which Scott agreed. (Tr. 437, 486). He went to the emergency room, where he was

7

diagnosed with suicidal ideation, depression, and anxiety, then discharged home. (R. 488). All of the foregoing records note Scott's compliance with medication.

In a January 2016 record, Scott expressed that he felt as though the devil was after him and that an internal voice was saying negative things and telling him to do bad things. (Tr. 433). Chronic auditory hallucinations "going on for years" were deemed significant. (Tr. 434). Scott also presented to the emergency room in January 2016 for chest pains caused by anxiety. (Tr. 585). As of that admission, Scott's diagnoses included chest pain, anxiety disorders, hypertension, gastro-esophageal reflux disease, fibromyalgia, rheumatoid arthritis, bipolar disorder, major depressive disorder, and PTSD. (Tr. 596).

A March 2016 record reflects Scott's panic attacks were down to three a day. (R. 656). His medication was changed in an attempt to control his symptoms better. (R. 657). In April 2016 Scott was admitted to the hospital as a psychiatric patient, with auditory hallucinations to kill himself and hurt others, paranoia, as evidenced by his belief cameras were in his house, and anxiety. (Tr. 449, 451, 453). That admission record also reflects physical problems of blindness in his left eye, chronic pain in ankles, hands, and back, sleep apnea, hypertension, rheumatoid arthritis, and fibromyalgia. (Tr. 451-452). He was discharged with diagnoses of schizoaffective disorder, bipolar type, currently depressed with psychotic features; panic disorder with agoraphobia; social anxiety disorder; and generalized anxiety disorder. (Tr. 449). He was noted to suffer from increased depression with suicidal thinking and psychosis, due in part to an inadequate response to psychiatric medications. (*Id.*).

Dr. Dick continued to treat Scott for fibromyalgia. From January to August 2016, Dr. Dick's records reflect Scott had tenderness on palpitation to his thoracic and cervical paraspinal muscles and received trigger point injections. (Tr. 602, 603, 605, 608,609). In August 2016, Scott

8

described his pain as a nine out of 10. (Tr. 614). In September 2016, Dr. Dick noted Scott's positive response to trigger point injections. (Tr. 601).

Meanwhile, in June 2016, Scott's mental health records reflected he was too anxious to drive or shop, he was paranoid about people being after him, he believed police stole his money and his sim card, and that the hospital put a microchip in him, which he tried to cut out of his arm. (R. 647, 650). Those records also note three or four prior psychiatric hospitalizations. (R. 651). July 2016 records reflect Scott's auditory hallucinations had increased with commands to hurt himself. (R. 644). In August 2016, Scott reported he worried more about demons trying to get him and he had more panic attacks. (Tr. 641). He also reported his auditory hallucinations continued. (*Id.*). His diagnoses included agoraphobia with panic disorder and schizoaffective disorder. (R. 642). His current medications were listed as Lodine, Nexium, Cymbalta, Norco, Benazepril HCl, Tramadol HCl, Horizant, Mirztazapine, Amtriptyline HCl, Hydrocodone, Etodolac, Xanax, Depakote, and Zyprexa. (R. 641). A follow up note in September 2016 stated, "Bobby seems worse today." (Tr. 626). His symptoms had increased in frequency, "psychotic symptoms seem to be chronically present," Scott reported delusions of persecution and stated the auditory hallucinations had worsened. (Tr. 626). Depressive symptoms were "chronically present," with an increase in crying spells, an increase in excessive worrying, and an increase in feelings of worthlessness. (*Id.*). Anxiety symptoms had improved, with panic attacks occurring "a few times a week." (*Id.*). His compliance with medication was "good." (*Id.*). He continued to have visual and auditory hallucinations. (Tr. 627).

### A. Weight Afforded to Treating Psychiatrist's Opinion

With this backdrop, Dr. Danial Swartz, M.D., opined in October 2016 that Scott's symptoms had become progressively more severe over the past year, with frequent auditory

9

hallucinations giving him commands, paranoid thoughts, panic attacks, and severe mood swings. (R. 640). Dr. Swartz notes these symptoms continued despite multiple hospitalizations and aggressive medication treatment. (*Id.*). Dr. Swartz further stated that due to the severity of Scott's symptoms, he would not be able to maintain employment and, due to the chronic nature of his illnesses, was likely looking at lifelong impairment. (*Id.*).

The ALJ dismissed Dr. Swartz's opinions, stating "[t]he only mental opinion of record is Dr. Swartz's conclusory statement that the claimant is unable to work due to his mental conditions. There is no opinion from any provider addressing the claimant's physical work-related abilities." (Tr. 23). The ALJ continued, "[t]hough the records established degenerative disc disease and arthritis per imaging and fibromyalgia with multiple tender points, there are no acute findings on imaging during the period in question and the claimant responds well to medications when taking them appropriately and trigger point injections." (Tr. 24).

However, the substantial direct evidence supports the exact opposite conclusion. In fact, despite the multiple physical and mental diagnoses Scott has received from multiple doctors, and despite multiple mental health hospitalizations, the ALJ failed to consider those records in determining that Scott mentally and physically could perform a limited range of light work and therefore did not afford proper weight to Scott's treating psychiatrist's opinion or his other treating physicians.

**B. Eleventh Circuit Standard as to Subjective Complaints of Pain**

When a claimant alleges disability based on complaints of pain or other symptoms, he must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of his alleged symptoms or evidence establishing that his medical condition could be reasonably expected to give rise to his alleged symptoms. *See* 20 C.F.R. §§

10

404.1529, 416.929; *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms but the claimant establishes he has an impairment that could reasonably be expected to produce his alleged symptoms, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effects on the claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002). If he or she does not fully credit the claimant's subjective pain testimony, the ALJ's decision must articulate his or her reasons and those reasons must be supported by substantial evidence. *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminated use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarified that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (March 16, 2016). SSR 16-3p further explains that the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, *9.

Here, the ALJ completely ignored the multiple diagnoses of carpal tunnel and/or Dequervain's tenosynovitis to find that Scott could engage in repetitive work such as assembler or packager. He ignored the diagnoses concerning Scott's disc problems and fibromyalgia to find Scott could engage in light work, which requires standing much of the day. And the ALJ ignored the multitude of records which reflected due to Scott's panic attacks and agoraphobia, he neither

drove nor went to stores, and that despite multiple attempts to get control with medications, Scott suffered from auditory hallucinations telling him to harm himself, or, more recently, harm his child. (Tr. 47).

Compounding the ALJ's errors was his finding "there are no acute findings on imaging during the period in question and the claimant responds well to medications when taking them appropriately and trigger point injections." (Tr. 24). Yet Scott testified the main reasons he could not work were "the pain level that I have and the voices that I have and visions that I have." (Tr. 42). While noting Scott's diagnoses of degenerative disc disease, arthritis, and fibromyalgia, the ALJ failed to consider or even mention Scott's allegations of pain. He states only that Scott's testimony of what he is able to do physically is unsupported. (Tr. 24). He fails to reference the multiple narcotic pain relievers Scott is prescribed.

Moreover, while failing to reference the pain standard at all, the ALJ further dismissed the medical records documenting "multiple tender points," finding they responded well to "injections and medications."[5] (Tr. 24). In considering claims of disability based on fibromyalgia, the Eleventh Circuit ruled that "[b]ecause the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Stewart v. Apfel*, 245 F.3d 793 (11th Cir. 2000)). *See also Todd v. Heckler,* 736 F.2d 641, 642 (11th Cir. 1984) (explaining that pain alone may be disabling and that it is improper for an ALJ to require objective medical evidence to support

---

[5] In its response, the defendant claims Scott did not challenge the ALJ's findings related to Scott's physical impairments. (Doc. 16 at 10 n.6). However, Scott asserts the ALJ failed to properly evaluate Scott's complaints of pain from his physical impairments. (Doc. 12 at 6).

a claim of disabling pain); *Robinson v. Astrue*, 365 F.App'x 993, 997 (11th Cir. 2010) ("The ALJ cannot discredit testimony as to the intensity or persistence of pain and fatigue solely based on the lack of objective medical evidence."). The Eleventh Circuit has "recognized that fibromyalgia 'often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms,' and that the 'hallmark' of fibromyalgia is therefore 'a lack of objective evidence.'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 63 (11th Cir. 2010) (citations omitted). The Court continued "As we have already explained, however, 'the nature of fibromyalgia itself renders ... over-emphasis upon objective findings inappropriate …. Rather, the credibility of [claimant's] complaints of disabling pain are bolstered by evidence that she made numerous visits to her doctors over the course of several years, underwent numerous diagnostic tests, and was prescribed numerous medications." *Somogy*, 366 F.App'x at 64-65 (internal citations omitted). The ALJ's reliance on a lack of "acute findings on imaging" is erroneous.

## C. Scott's Mental Health Records

Similarly, the ALJ's dismissal of Scott's mental health records is unsupportable. Although the ALJ comments, "the mental status exams do not support the limitations alleged by the claimant, especially during periods of sobriety and compliance with recommended treatment," (Tr. 24), no doctor opined that Scott was non-compliant or that he excessively drank. Moreover, while, as the ALJ noted, Scott declined therapy (Tr. 23), his records reflect he did so because he could not afford it. (Tr. 642, 645). Scott testified his doctors were "pretty aggressive" with the medications, but "for some reason, we haven't been able to get anything to work yet." (Tr. 45). He further explained some days he spends in bed because "I'm hurting. I don't feel good, and, I just have a hard time. I can't get the voices to shut up. I don't feel like being alive. Sometimes I, I feel like killing myself, and sometimes they tell me to go kill other people…" (Tr. 47). He further testified he

does not have friends, does not go to church, and has no relationship with his own family. (Tr. 48, 50). He has no hobbies and does not drive. (Tr. 49). The ALJ's findings to the contrary (such as that Scott spent time with friends and family (Tr. 19)) lack support. Similarly, despite Scott's repeated statements he could not drive and his wife paid the bills, the ALJ found he did these things. (Tr. 19, *see also* 206-208). In sum, the ALJ's consideration of Scott's symptoms under the Listings in 20 C.F.R. Part 404, Subpart P, particularly Listings 12.03, 12.04, and 12.06, simply ignored Scott's well-documented symptoms, hallucinations, and panic attacks.

In consideration of the foregoing, the Commissioner's decision will be reversed and remanded for further proceedings, as the opinion of the ALJ is not supported by substantial evidence, and the ALJ failed to apply the proper legal standards in his consideration of the evidence. The ALJ should apply the pain standard as mandated by the Eleventh Circuit and give fair credence to Scott's extensive mental health records. The ALJ also must consider all of Scott's medically diagnosed physical ailments. The ALJ should reconsider and reweigh all of the evidence in the record upon remand.

## VI. Conclusion

For the reasons set forth above, the decision of the Commissioner is due to be **REVERSED** and this action **REMANDED** for further proceedings consistent with this Memorandum Opinion. A separate order will be entered.

DONE this 30th day of September, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE